United States Court of Appeals,

Eleventh Circuit.

Nos. 96-8972, 96-9491, 97-8062.

Robert FALANGA, Individually and Ronald F. Chalker, Individually, Plaintiffs-Appellees, Cross-Appellants,

v.

STATE BAR OF GEORGIA, Defendant-Appellant, Cross-Appellee.

Robert FALANGA, Individually;  Ronald F. Chalker, Individually, et al., Plaintiffs-Appellants,

v.

STATE BAR OF GEORGIA, Defendant-Appellee.

Aug. 19, 1998.

Appeals from the United States District Court for the Northern District of Georgia. (No. 1:95-CV-2160-GET), G. Ernest Tidwell, Judge.

Before HATCHETT, Chief Judge, and EDMONDSON and COX, Circuit Judges.

HATCHETT, Chief Judge:

The principal issue in this case is whether Georgia's prohibiting lawyers and their agents from soliciting professional employment from potential clients face-to-face and without invitation survives First Amendment commercial speech scrutiny as applied to appellees/cross-appellants. We conclude that it does, affirming in part and reversing in part the judgment of the district court.

I. BACKGROUND

Appellees/cross-appellants Robert Falanga and Ronald Chalker, who are licensed to practice law in and members of the State Bar of Georgia, primarily represent plaintiffs pursuing personal injury and wrongful death claims arising out of automobile accidents.  Falanga and Chalker serve as the only lawyers in their five-office law firm headquartered in Atlanta.  Most of their clients are

poor and uneducated. Falanga and Chalker retain new clients through in-person, telephone and direct mail solicitation. They obtain the names of potential clients in two principal ways. First, the law firm's "public relations" agent asks doctors and chiropractors to recommend Falanga and Chalker to injured patients and grieving family members in need of legal services. In return, Falanga and Chalker treat the doctors and chiropractors to lunch and provide free legal advice. Additionally, law firm employees sift through police reports at the Department of Safety. With this information, Falanga and Chalker mail approximately 300 letters and brochures per week to accident victims.

In June 1992, upon receiving a sworn grievance from a chiropractor, the State Bar of Georgia began investigating Falanga and Chalker for breaches of several professional conduct standards. Ultimately, the State Bar "credibl[y] threat[ened] [to] prosecut[e]" Falanga and Chalker for violating Standards 5(a)(2), 5(a)(3), 6(b), 7(a), 8, 12, 13, 16, 17(a) and 18 of Rule 4-102. *Wilson v. State Bar of Ga.,* 132 F.3d 1422, 1428 (11th Cir.1998).[1] To stop disciplinary proceedings,

---

[1]The State Bar does not challenge Falanga's and Chalker's individual or collective standing to bring this lawsuit. Nevertheless, we have combed the record to satisfy our "independent obligation to consider standing[.]" *Jacobs v. Florida Bar,* 50 F.3d 901, 904 n. 12 (11th Cir.1995); *see Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (the existence of standing "must be supported adequately by the evidence adduced at trial") (internal quotation marks and citations omitted). In investigatory correspondence with Falanga and Chalker, the State Bar specifically referenced all but Standards 7(a), 17(a) and 18. These three standards, however, closely relate to the ones that the State Bar specifically referenced. As such, a "credible threat of prosecution" looms over Falanga and Chalker as to all ten provisions. *Jacobs,* 50 F.3d at 904 (a lawyer possesses standing to challenge the constitutionality of rules of professional responsibility if the lawyer shows "that either (1) he [or she] was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution") (internal quotation marks and citations omitted). Additionally, Falanga and Chalker testified that they intend to engage in conduct that these standards prohibit. *See Texans Against Censorship, Inc. v. State Bar of Tex.,* 888 F.Supp. 1328, 1340 (E.D.Tex.1995) (dismissing lawyers' constitutional challenges because they expressed no "credible intention of engaging in conduct that would be proscribed by" certain rules of conduct), *aff'd,* 100 F.3d 953

Falanga and Chalker filed a complaint in the United States District Court for the Northern District of Georgia. Pursuant to 42 U.S.C. § 1983, Falanga and Chalker alleged, among other things, that enforcement of these standards would violate their commercial speech rights under the First Amendment, as incorporated through the Fourteenth Amendment.[2] After conducting a non-jury trial, the district court sustained as constitutional all but the restrictions on lawyers' in-person, uninvited solicitation, Standards 12, 16 (only as it relates to 12) and 17(a).[3] Declaring these three standards unconstitutional, the court enjoined the State Bar from enforcing them against any lawyer.

## II. DISCUSSION

In part A, we discuss whether Standards 12, 13, 16 and 17(a)—prophylactic bans on lawyers' and their agents' in-person, uninvited solicitation—are constitutional as applied to Falanga

---

(5th Cir.1996).

[2]Prior to trial, the parties signed a written agreement that the State Bar would not prosecute Falanga or Chalker until the district court resolved the lawsuit. They also agreed to substitute a nominal plaintiff, Ralph Goldberg, to challenge the standards that Falanga and Chalker faced formal charges for violating. (Goldberg is not a party to this appeal.) The district court accepted this agreement and declined to abstain from deciding the case. *See Younger v. Harris,* 401 U.S. 37, 53, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). No party takes issue with the district court's action. Because it appears that "*Younger* abstention is *not* jurisdictional," we assume without deciding that the district court properly accepted the agreement not to abstain. *Benavidez v. Eu,* 34 F.3d 825, 829 (9th Cir.1994).

[3]The district court rejected Falanga's and Chalker's contentions that the standards were impermissibly vague, the standards' disparate treatment of personal injury lawyers ran afoul of the Equal Protection Clause, and the State Bar's application of its rule of procedure violated their procedural due process rights. Falanga and Chalker do not cross-appeal the equal protection and due process rulings. They do, however, "maintain that most, if not all, of the rules are so vague that they cannot pass first [sic] Amendment muster." Answer/Initial Cross-Appeal Brief at 15. We reject this cursory contention as meritless. *See Wilson,* 132 F.3d at 1430 (rules are not impermissibly vague if lawyers "can derive a core meaning from" them).

and Chalker.[4]  In part B, we address the constitutionality of the standards on lawyers' advertising that the district court upheld—Standards 5(a)(2), 5(a)(3), 6(b), 7(a), 8 and 18.  Where, as here, the parties to a First Amendment case dispute only the district court's findings of constitutional (as opposed to historical) fact, our standard of review is *de novo.  See Don's Porta Signs, Inc. v. City of Clearwater,* 829 F.2d 1051, 1053 n. 9 (11th Cir.1987) ("In cases involving first amendment claims, an appellate court must make an independent examination of the whole record....  [A]n appellate court is not bound by the "clearly erroneous' standard of review in determining whether a commercial speech regulation directly advances the government's goals or is more extensive than necessary.") (citations omitted), *cert. denied,* 485 U.S. 981, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988).

A.

---

[4]The parties do not dispute that all of Falanga's and Chalker's constitutional claims are as-applied ones, even though portions of the record indicate that they challenged the standards on their face. *E.g.,* Answers to Interrogatories at 5 (The State Bar "has promulgated, maintained and now sought to enforce, Professional Standards which are *facially* violative of the First Amendment of the Constitution of the United States.") (emphasis added).  Wisely, Falanga and Chalker abandoned their facial challenges, perhaps realizing that "when a plaintiff attacks a law facially, the plaintiff bears the burden of proving that the law could never be constitutionally applied." *Jacobs,* 50 F.3d at 906 n. 20. To be sure, Falanga and Chalker "seek to vindicate their own rights," not the rights of all Georgia lawyers. *Jacobs,* 50 F.3d at 906.

All 50 states and the District of Columbia regulate lawyers' and their agents' in-person solicitation of professional employment.[5]  Georgia is no exception.[6]  It prohibits lawyers from

[5]*See* Alabama Rules of Ct., R. Prof. Conduct 7.3(a) (West 1998);  Alaska Ct. Rules, R. Prof. Conduct 7.3 (West 1997);  Ariz.Rev.Stat. Ann., Supreme Ct. R. 42, ER 7.3 (1998);  Arkansas Rules of Ct., Model R. Prof. Conduct 7.3 (West 1998);  Cal. Bus. & Prof.Code, R. Prof. Conduct for the State Bar 1-400(C) (West 1998);  Colo.Rev.Stat. Ann., R. Prof. Conduct 7.3 (West 1998);  Connecticut Rules of Ct., Rules of Professional Conduct 7.3(a) (West 1997);  Delaware Rules of Ct., Lawyers' R. Prof. Conduct 7.3 (West 1997);  District of Columbia Rules of Ct., Rules Governing the Bar app. A, R. Prof. Conduct 7.1(b)-(d) (West 1998);  R. Reg. Fla. Bar 4-7.4 (1998);  Georgia Rules of Ct. Ann., Rules & Regulations for the Org. and Gov't of the State Bar of Ga., Rule 4-102, Standards 12, 13, 17 (Michie 1998);  Hawai"i Ct. Rules, Rules of the Supreme Ct., Ex. A, R. Prof. Conduct 7.3 (West 1997);  Idaho Rules of Ct., R. Prof. Conduct 7.3 (West 1997);  Ill.Ann.Stat., Supreme Ct. Rules, R. Prof. Conduct 7.3 (Smith-Hurd 1998);  Ind.Code Ann., R. Prof. Conduct 7.3 (West 1998);  Iowa Code Ann. tit. XV, subtit. 2, ch. 602 app., Code Prof. Resp. for Lawyers, DR 2-101(B)(4)(a) (West 1998);  Kansas Ct. Rules & Procedure, Supreme Ct. R. 226, Model R. Prof. Conduct 7.3 (West 1997);  Ky.Rev.Stat. Ann., Supreme Ct. R. 3.130, R. Prof. Conduct 7.30 (Baldwin 1998);  La.Rev.Stat. Ann., Articles of Incorp. of the State Bar Ass'n, art. XVI, R. Prof. Conduct 7.2 (West 1998);  Maine Rules of Ct., Bar Rules, Code Prof. Resp., Rule 3.9(f) (West 1997);  Maryland Rules of Ct., R. Proced. 16-812, R. Prof. Conduct 7.3 (West 1998);  Massachusetts Rules of Ct., Supreme Judicial Ct. R. 3:07, R. Prof. Conduct 7.3 (West 1998);  Michigan Rules of Ct., R. Prof. Conduct 7.3 (West 1998);  Minn.Stat. Ann., R. Prof. Conduct 7.3 (West 1997);  Mississippi Rules of Ct., R. Prof. Conduct 7.3 (West 1997);  Missouri Ct. Rules, Supreme Ct. R. 4, R. Prof. Conduct 4-7.3 (West 1998);  Montana Rules of Ct., R. Prof. Conduct 7.3 (West 1997);  Nebraska Ct. Rules & Procedure, Rules of the Supreme Ct./Ct. of Appeals, Code Prof. Resp., DR 2-104 (West 1998);  Nev.Rev.Stat., Supreme Ct. Rules, R. Prof. Conduct 197 (1997);  N.H. Stat. Ann., R. Prof. Conduct 7.3 (1997);  New Jersey Rules of Ct., R. Prof. Conduct 7.3 (West 1997);  New Mexico R. of Ct., R. Prof. Conduct 16-703 (West 1998);  N.Y. Jud. Law app., Code Prof. Resp., DR 2-103(A), DR 2-104(A)-(C) (McKinney 1997);  North Carolina Rules of Ct., State Bar Rules, Rev. R. Prof. Conduct 7.3 (West 1997);  North Dakota Ct. Rules, R. Prof. Conduct 7.1 (West 1998);  Ohio Rev.Code Ann., Code Prof. Resp., DR 2-103(A), DR 2-104(A) (Baldwin 1998);  Okla. Stat. Ann. tit. 5, R. Prof. Conduct 7.3 (West 1998);  Oregon Rules of Ct., Code Prof. Resp., DR 2-104 (West 1998);  42 Pa. Cons.Stat. Ann., R. Prof. Conduct 7.3 (1998);  Rhode Island Rules of Ct., Supreme Ct. Rules, art. V, R. Prof. Conduct 7.3 (West 1998);  S.C.Code Ann., Appellate Ct. Rule 407, R. Prof. Conduct 7.3 (Law.Co-op.1997);  S.D. Codified Laws Ann. tit. 16, chs. 16-18 app., R. Prof. Conduct 7.3 (1997);  Tennessee Rules of Ct., Supreme Ct. R. 8, Code Prof. Resp., DR 2-104 (West 1997);  Tex. Gov't Code Ann. tit. 2, subtit. Gapp. A, art. X, § 9, Disciplinary R. Prof. Conduct 7.03 (West 1998);  Utah Rules of Ct., Supreme Ct. Rules of Prof. Practice, R. Prof. Conduct 7.3 (West 1998);  Vermont Rules of Ct., Code Prof. Resp., DR-2-104 (West 1998);  Virginia Rules of Ct., Supreme Ct. Rules, part 6, § 2, Code Prof. Resp., DR 2-103(A), (F) (West 1997);  Washington Ct. Rules, R. Prof. Conduct 7.3 (West 1997);  West Virginia Rules

5

engaging in in-person, uninvited solicitation:

> A lawyer shall not solicit professional employment as a private practitioner for himself, his partner or associate, through direct personal contact with a non-lawyer who has not sought his advice regarding employment of a lawyer.

Georgia Rules of Ct. Ann., Rules & Regulations for the Org. and Gov't of the State Bar of Ga., Rule 4-102, Standard 12 (Michie 1998).[7] Similarly, lawyers may not solicit through an agent or pay for unregulated referrals:

> A lawyer shall not compensate or give anything of value to a person or organization to recommend or secure his employment by a client, or as a reward for having made a recommendation resulting in his employment by a client;

except that he may pay for public communications permitted by Standard 5 and the usual and reasonable fees or dues charged by a bona fide lawyer referral system....

---

of Ct., R. Prof. Conduct 7.3 (West 1997); Wis. Stat. Ann., Supreme Ct. Rules, ch. 20, R. Prof. Conduct 7.3 (West 1998); Wyoming Rules of Ct., R. Prof. Conduct for Att'ys at Law 7.3(a) (West 1997).

[6]The Supreme Court of Georgia possesses authority "to regulate and govern the practice of law" in the state. O.C.G.A. § 15-19-31 (Michie 1994). Pursuant to legislative permission, the supreme court established "as an administrative arm of the court a unified self-governing bar association ... known as the "State Bar of Georgia,' composed of all persons licensed to practice law" in the state. O.C.G.A. § 15-19-30. The State Bar recommends standards of lawyer conduct, but they do not become binding on lawyers until the supreme court adopts them. *See* O.C.G.A. § 15-19-31.

[7]Throughout this opinion, we quote only those portions of the standards that Falanga and Chalker constitutionally challenged.

State authorities may punish a lawyer who violates Standard 12 with any level of discipline up to and including disbarment. *See* Standard 12; Rule 4-102(b).

6

Georgia Rules of Ct. Ann., Rules & Regulations for the Org. and Gov't of the State Bar of Ga., Rule

4-102, Standard 13 (Michie 1998).[8]  Finally, Georgia prohibits lawyers from retaining "strangers"

to whom they or their agents have rendered unsolicited legal advice:

> A lawyer shall not accept employment when he knows or it is obvious that the person who seeks his services does so as a result of conduct by any person or organization prohibited under Standards 12[ ][or] 13....

Georgia Rules of Ct. Ann., Rules & Regulations for the Org. and Gov't of the State Bar of Ga., Rule

4-102, Standard 16 (Michie 1998).[9]  And,

> [a] lawyer who has given in-person unsolicited advice to a layperson that he should obtain counsel or take legal action shall not accept employment resulting from that advice, except:
>
> (a) A lawyer may accept employment from a close friend, relative, former client (if the advice is germane to the former employment), or one whom the lawyer reasonably believes to be a client[.]

Georgia Rules of Ct. Ann., Rules & Regulations for the Org. and Gov't of the State Bar of Ga., Rule

4-102, Standard 17(a) (Michie 1998).[10]

Professional responsibility rules on lawyer advertising usually concern purely commercial

speech, as do Georgia's standards on in-person solicitation.  *See Shapero v. Kentucky Bar Ass'n,* 486

U.S. 466, 472, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988) ("Lawyer advertising is in the category of

---

[8]At the time the district court issued its memorandum opinion, Standard 13 contained two subsections;  it considered only the constitutionality of then-Standard 13(b).  Effective August 29, 1996, the Supreme Court of Georgia eliminated Standard 13(a).  *See* Standard 13 cmt.  The current version of Standard 13 is identical to then-Standard 13(b).  State authorities may punish a lawyer who violates Standard 13 with any level of discipline up to and including disbarment. *See* Standard 13;  Rule 4-102(b).

[9]As with Standards 12 and 13, state authorities may punish a lawyer who violates Standard 16 with any level of discipline up to and including disbarment.  *See* Standard 16;  Rule 4-102(b).

[10]Unlike with Standards 12, 13 and 16, the most severe level of discipline a lawyer who violates Standard 17(a) may receive is a public reprimand.  *See* Standard 17(a);  Rule 4-102(b).

constitutionally protected commercial speech."). As such, in determining their constitutionality, courts apply the "now familiar" framework set forth in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), and its progeny. *Shapero,* 486 U.S. at 472, 108 S.Ct. 1916. To justify a "regulation of lawyer solicitations for pecuniary gain[,]" the state must show that: (1) "it has a substantial interest in proscribing speech"; (2) "the regulation advances the asserted state interest in a direct and material way"; and (3) "the extent of the restriction is in reasonable proportion to the interest served." *Shapero,* 486 U.S. at 472, 108 S.Ct. 1916; *Miller v. Stuart,* 117 F.3d 1376, 1382 (11th Cir.1997) (collecting Supreme Court precedents), *cert. denied,* --- U.S. ----, 118 S.Ct. 852, 139 L.Ed.2d 753 (1998).[11]

At the close of the State Bar's case-in-chief, the district court granted Falanga's and Chalker's motions for directed verdict as to Standards 12, 16 (only as it relates to 12) and 17(a).[12] Applying

---

[11]Alternatively, the state may ban without justification commercial speech that "concerns unlawful activity or is misleading." *Miller,* 117 F.3d at 1382. Solicitation for professional employment in and of itself neither "concerns unlawful activity" nor "is misleading." Therefore, our discussion does not concern the threshold prong of the *Central Hudson* test. *See Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343 ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading.").

[12]At trial, the State Bar presented evidence before Falanga and Chalker did because "the party seeking to uphold the restriction on commercial speech carries the burden of justifying it." *Edenfield v. Fane,* 507 U.S. 761, 770, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (internal quotation marks and citations omitted).

Although Falanga and Chalker labeled their requested relief as a motion for a directed verdict, they in substance moved for a judgment on partial findings. *See* Fed.R.Civ.P. 52(c) (non-jury trials). Directed verdicts apply only in civil jury trials. *See Schlitt v. Florida,* 749 F.2d 1482, 1482-83 (11th Cir.1985). Even if the trial had been before a jury, recent amendments to the Federal Rules of Civil Procedure have replaced the phrase "directed verdict" with "judgment as a matter of law." *See* Fed.R.Civ.P. 50 & note ("The [1991] revision abandons the familiar terminology of *direction of verdict* [.]").

8

the *Central Hudson* test, the court held that: (1) the State Bar has a substantial interest in (a) "protecting the public from aspects of solicitation that involve fraud, undue influence, intimidation and overreaching[,]" (b) "protecting the tranquility and privacy of personal injury victims and their loved ones against intrusive, unsolicited in-person contact from lawyers[,]" and (c) improving the public's confidence in the legal profession; but (2) the proscriptions on lawyers' in-person, uninvited solicitation do not directly and materially advance these interests because "[a]lthough the [State Bar's] anecdotal evidence demonstrates certain harms that may be associated with in-person solicitation, ... [it] has failed to demonstrate that these harms are present in all circumstances"; and (3) the proscriptions are "substantially broader than necessary to prevent the harms asserted[.]"

In contrast to its rulings on Standards 12, 16 (only as it relates to 12) and 17(a), the district court found Standards 13 and 16 (only as it relates to 13) to be constitutional. The court concluded that: (1) the State Bar has a substantial interest in (a) "promoting the independent judgment of lawyers[,]" (b) "prohibiting the practice of law by a layman[,]" and (c) "protecting consumers from overreaching by those to be compensated"; (2) the proscriptions "bear[ ] a direct relationship" to advancing these interests; and (3) "prohibiting lawyers from engaging in the practice of paying for referrals is a reasonable method of preventing the harm caused by the overreaching of certain runners[.]"

The State Bar challenges the district court's judgment as to Standards 12, 16 (only as it relates to 12) and 17(a), while Falanga and Chalker cross-appeal its judgment as to Standards 13 and 16 (only as it relates to 13). The essence of the parties' dispute lies in the application of two Supreme Court cases: *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), where the Court upheld Ohio's rules against in-person solicitation as applied to a

9

plaintiff-side personal injury lawyer, and *Edenfield v. Fane,* 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), where the Court struck down Florida's ban on in-person solicitation as applied to a certified public accountant.

In *Ohralik,* a personal injury lawyer "approached two young [automobile] accident victims at a time when they were especially incapable of making informed judgments or of assessing and protecting their own interests." 436 U.S. at 467, 98 S.Ct. 1912. The driver was laying in traction in a hospital bed, and the passenger had just returned home from the hospital. The lawyer solicited both victims individually, "urg[ing]" that they retain him. 436 U.S. at 467, 98 S.Ct. 1912. He relayed information about the driver's parents' automobile insurance contract to the passenger. Concealing a tape recorder to evince the victims' assent, the lawyer "emphasized that his fee would come out of the recovery, thereby tempting the young [adults] with what sounded like a cost-free and therefore irresistible offer." 436 U.S. at 467, 98 S.Ct. 1912. Finally, the day after he obtained consent to represent both the driver and the victim, the lawyer refused the passenger's request that he withdraw. 436 U.S. at 467, 98 S.Ct. 1912.

After both the driver and the passenger filed grievances, Ohio authorities sought to discipline the lawyer for in-person solicitation, in violation of Disciplinary Rules (DR) 2-103(A) and 2-104(A) of the state's Code of Professional Responsibility. 436 U.S. at 452-53, 98 S.Ct. 1912. DR 2-103(A) provides that "[a] lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a non-lawyer who has not sought his advice regarding employment of a lawyer." 436 U.S. at 453 n. 9, 98 S.Ct. 1912.[13] Similarly, DR 2-104(A) reads:

---

[13]Ohio's current version of DR 2-103(A) is substantially the same as the version at issue in *Ohralik. See* Ohio Rev.Code Ann., Code Prof. Resp., DR 2-103(A) (Baldwin 1998) (gender neutral changes).

A lawyer who has given unsolicited advice to a layman that he should obtain counsel or take legal action shall not accept employment resulting from that advice, except that:

(1) A lawyer may accept employment by a close friend, relative, former client (if the advice is germane to the former employment), or one whom the lawyer reasonably believes to be a client.

436 U.S. at 453 n. 9, 98 S.Ct. 1912.[14] The Supreme Court of Ohio sanctioned the lawyer, rejecting his contention that enforcement of the two rules violated his First Amendment commercial speech rights. 436 U.S. at 453-54, 98 S.Ct. 1912.

The United States Supreme Court affirmed, holding that a state "constitutionally may discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent." 436 U.S. at 449, 468, 98 S.Ct. 1912. The Court characterized Ohralik's conduct as "a striking *example* of the potential for overreaching that is inherent in a lawyer's in-person solicitation of professional employment." 436 U.S. at 468, 98 S.Ct. 1912 (emphasis added). Although *Ohralik* predated *Central Hudson,* the Court's conclusions fit within its framework: (1) the State has a substantial interest in protecting the public from "those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of vexatious conduct"; (2) "[t]he State's perception of the potential for harm in circumstances" where "a lawyer, a professional trained in the art of persuasion, personally solicits an unsophisticated, injured, or distressed lay person" was "well founded"; and (3) the State need not prove actual harm to the person solicited because in one-on-one situations it is "difficult or

---

[14]Like the current version of Ohio's DR 2-103(A), the current version of DR 2-104(A) is substantially the same as the version at issue in *Ohralik. See* Ohio Rev.Code Ann., Code Prof. Resp., DR 2-104(A) (Baldwin 1998) (substituting parenthesis for commas).

11

impossible to obtain reliable proof of what actually took place." 436 U.S. at 462, 464-66, 98 S.Ct. 1912 (internal quotation marks omitted).

Nearly fifteen years after *Ohralik,* the Supreme Court decided *Edenfield.* In that case, a certified public accountant (CPA) wanted to "obtain[ ] business clients by making unsolicited telephone calls to their executives and arranging meetings to explain his services and expertise." 507 U.S. at 763, 113 S.Ct. 1792. Florida law, however, prohibited the CPA from doing so:

> [A] CPA shall not by any direct, in-person, uninvited solicitation [including telephone calls] solicit an engagement to perform public accounting services ... where the engagement would be for a person or entity not already a client of the CPA, unless such person or entity has invited such a communication.

507 U.S. at 764, 113 S.Ct. 1792 (quoting Fla. Admin. Code § 21A-24.002(2)(c), 21A-24.002(3) (1992)) (internal quotation marks and alterations omitted). The United States Supreme Court agreed with the CPA that "Florida's blanket ban on direct, in-person, uninvited solicitation by CPA's cannot be sustained as applied to [the CPA's] proposed speech." 507 U.S. at 767, 113 S.Ct. 1792. Reaching only the first two prongs of the *Central Hudson* test, the Court concluded that: (1) the State has a substantial interest in (a) "ensuring the accuracy of commercial information in the marketplace[,]" (b) "protect[ing] ... potential clients' privacy[,]" and (c) "maintaining standards of ethical conduct in the licensed professions[,]" including requiring "CPA independence and ensuring against conflicts of interest"; but (2) Florida failed to "demonstrate[ ] that, as applied in the business context, the ban on CPA solicitation advance[d] its asserted interests in any direct and material way." 507 U.S. at 769-71, 113 S.Ct. 1792.

Reviewing the record, the *Edenfield* Court found "no studies" nor "any anecdotal evidence, either from Florida or another State" that "suggest[ed] personal solicitation of prospective business clients by CPA's creates the dangers of fraud, overreaching, or compromised independence that

12

[Florida] claim[ed] to fear."  507 U.S. at 771, 113 S.Ct. 1792.  The Court rejected as "conclusory" Florida's only evidence, a sworn affidavit of the former chairperson of the state's accounting board.  507 U.S. at 771, 113 S.Ct. 1792.  Finally, the Court pointed to national reports and accounting literature that acknowledged the absence of "empirical data" or "persuasive evidence" that in-person solicitation "likely ... lead[s] to false or misleading claims[,] oppressive conduct" or "compromised independence" on the part of CPAs. 507 U.S. at 772, 113 S.Ct. 1792.

Plainly, this case is closer to *Ohralik* than *Edenfield.*  Georgia and Ohio restrict lawyers' in-person, uninvited solicitation through substantially identical means.  Falanga and Chalker, like Ohralik, practice personal injury law.  All three lawyers (and/or their agents) solicit automobile accident victims face-to-face.  Unlike the CPA in *Edenfield,* Falanga and Chalker do not contact "prospective *business* clients[.]"  507 U.S. at 771, 113 S.Ct. 1792 (emphasis added).  Rather, most of their clients are poor and uneducated individuals.  Thus, although Falanga's and Chalker's conduct may not be as egregious as Ohralik's, they cannot seriously contend that *Edenfield* saves their case.  *See Ohralik,* 436 U.S. at 468, 98 S.Ct. 1912 ("[T]he absence of explicit proof or findings of harm or injury is immaterial.").

In case our interpretation of these two authorities leaves any doubt about their differences, the Supreme Court itself distinguished *Edenfield* from *Ohralik:*

> Unlike a lawyer, a CPA is not "a professional trained in the art of persuasion."  A CPA's training emphasizes independence and objectivity, not advocacy....  The typical client of a CPA is far less susceptible to manipulation than the young accident victim in *Ohralik.*  Fane's prospective clients are sophisticated and experienced business executives who understand well the services that a CPA offers....  In general, the prospective client has an existing professional relation with an accountant and so has an independent basis for evaluating the claims of a new CPA seeking professional work.

13

*Edenfield,* 507 U.S. at 775, 113 S.Ct. 1792 (internal citations omitted). It is true that the *Edenfield* Court viewed *Ohralik* 's holding as "narrow and depend[ent] upon certain unique features of in-person solicitation by lawyers that were present in the circumstances of that case." *Edenfield,* 507 U.S. at 774, 113 S.Ct. 1792 (internal quotation marks omitted). As the *Edenfield* Court's quoted excerpt from *Ohralik* makes clear, however, the *essential* circumstances of *Ohralik* were that a lawyer engaged in "uninvited" in-person solicitation of "unsophisticated, injured, or distressed lay person[s]." *Edenfield,* 507 U.S. at 774-75, 113 S.Ct. 1792 (quoting *Ohralik,* 436 U.S. at 465-66, 98 S.Ct. 1912). To be sure, Falanga's and Chalker's circumstances fall squarely within this category of "ambulance chasing." *Brotherhood of R.R. Trainmen v. Virginia ex rel. Va. State Bar,* 377 U.S. 1, 6, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964) (*cited in Ohralik,* 436 U.S. at 459 n. 16, 98 S.Ct. 1912).

Notwithstanding their reliance on *Edenfield,* Falanga and Chalker dispute the sufficiency of the State Bar's evidence, contending that it failed to advance any concrete proof of the harm that allegedly results from in-person solicitation. We, however, are not convinced. It is true that the State Bar may not rely on "mere speculation or conjecture" to satisfy its burden of justifying Georgia's proscriptions. *Edenfield,* 507 U.S. at 770, 113 S.Ct. 1792. On the other hand, commercial speech jurisprudence does not require it to present "empirical data ... accompanied by a surfeit of background information." *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) ("[W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether[.]"). Rather, the State Bar's case may rest "solely on history, consensus, and simple common sense[.]" *Went For It,* 515 U.S. at 628, 115 S.Ct. 2371 (internal quotation marks and citation omitted).

14

Given these boundaries, the State Bar met its burden of proof as a matter of law. First and foremost, because for all intents and purposes this case *is Ohralik,* the State Bar's reliance on that Court's findings of fact and conclusions of law may have been sufficient in and of itself to justify the standards. *See Went For It,* 515 U.S. at 628, 115 S.Ct. 2371; *Ohralik,* 436 U.S. at 468, 98 S.Ct. 1912 (facts of the case "demonstrate the need for prophylactic regulation in furtherance of the State's interest in protecting the lay public").[15] The State Bar, however, presented more. Both its general counsel and assistant general counsel provided anecdotal evidence, relaying the public's complaints about in-person, telephonic and direct mail solicitation. An accident victim herself testified about the intrusive nature of solicitation that Falanga himself initiated.[16]

Additionally, the State Bar presented the results of an independently-conducted study entitled "Consumer Reactions to Legal Services Advertising in the State of Georgia." Although this study focused on television advertising, some of its conclusions are relevant to in-person solicitation.[17] As the district court recognized, the study posits that the more intrusive the advertising method, the more negative the public's view of lawyers. In fact, the percentage of unfavorable responses increased steadily as consumers considered yellow pages, television, direct mail and telephonic solicitation, and "personal contact" was the "single greatest influence on [the public's] image of

---

[15]*But cf. Schwartz v. Welch,* 890 F.Supp. 565, 574-76 (S.D.Miss.1995) (although the professional conduct rules at issue had been upheld "in different forums[,]" the court declared them unconstitutional because the state "ignored [its] burden" and failed to provide "proof").

[16]The district court acknowledged that this "anecdotal evidence demonstrates certain harms that may be associated with in-person solicitation[.]"

[17]At trial, even Falanga's counsel admitted that the study was at least partially relevant to in-person solicitation. Tr. at 115 (study "deals with the effect of very individual elements of advertising *and solicitation* on both public image as well as fraud or other kinds of conduct that might arise from it") (emphasis added).

15

lawyers." Overall, the highest percentage of respondents agreed with the proposition that "lawyers track down injured people and try to talk them into taking legal action." Instead, according to the study, consumers "[o]verwhelmingly" prefer to choose a lawyer through methods that they control, that is, references from family, friends, co-workers, etc. From this information, the State Bar could reasonably infer that the majority of legal service consumers view in-person solicitation—whether through lawyers or their agents—as unduly intrusive, destructive to the court system and deserving of regulation.

Supplementing this anecdotal and study evidence, history cuts in favor of the State Bar. Although the Supreme Court of Georgia adopted the standards at issue in the early 1980s, proscriptions on in-person solicitation have been a part of the State Bar's regulatory scheme since its creation in 1963. Thus, it is "not surprising" that the State Bar's evidence lacked specificity on the extent of the harm associated with in-person solicitation. *Texans Against Censorship, Inc. v. State Bar of Texas,* 888 F.Supp. 1328, 1353 (E.D.Tex.1995) (upholding, among other rules, Texas's proscription on lawyers' telephonic solicitation, noting that "Texas lawyers have been prohibited from telephonic solicitation for some time, and hence a lack of evidence as to fraudulent telephonic solicitations by Texas lawyers is not surprising"), *aff'd,* 100 F.3d 953 (5th Cir.1996).

In addition to history, consensus supports the State Bar's view. The American Bar Association (ABA) opines that

> [t]here is a potential for abuse inherent in direct in-person or live telephone contact by a lawyer with a prospective client known to need legal services. These forms of contact between a lawyer and a prospective client subject the layperson to the private importuning of the trained advocate in a direct interpersonal encounter. The prospective client, who may already feel overwhelmed by the circumstances giving rise to the need for legal services, may find it difficult fully to evaluate all available alternatives with reasoned judgment and appropriate self-interest in the face of the lawyer's presence and insistence upon being

16

retained immediately.  The situation is fraught with the possibility of undue influence, intimidation, and over-reaching.

A.B.A. Model Rules of Professional Conduct, Rule 7.3 cmt. (1995).  Accordingly, the ABA recommends banning in-person, uninvited solicitation for pecuniary gain:

> (a) A lawyer shall not by in-person or live telephone contact solicit professional employment from a prospective client with whom the lawyer has no family or prior professional relationship when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain.

> (b) A lawyer shall not solicit professional employment from a prospective client ... by in-person or telephone contact even when not otherwise prohibited by paragraph (a), if:

> > (1) the prospective client has made known to the lawyer a desire not to be solicited by the lawyer;  or

> > (2) the solicitation involves coercion, duress or harassment.

Model Rule 7.3.  No less than 31 states proscribe in-person solicitation in the same or similar

manner.[18]  Ten other states have rules identical or similar to those of Georgia and Ohio.[19] Two states

---

[18]These states are:  (1) Alabama, (2) Alaska, (3) Arizona, (4) Arkansas, (5) Colorado, (6) Delaware, (7) Florida, (8) Hawai"i, (9) Idaho, (10) Illinois, (11) Indiana, (12) Kansas, (13) Kentucky, (14) Louisiana, (15) Michigan, (16) Minnesota, (17) Mississippi, (18) Nevada, (19) New Hampshire, (20) New Jersey, (21) North Carolina, (22) Oklahoma, (23) Pennsylvania, (24) Rhode Island, (25) South Carolina, (26) South Dakota, (27) Tennessee, (28) Texas, (29) Utah, (30) Washington, and (31) West Virginia.  (For citations, see *supra* note 5.) *Cf. O'Quinn v. State Bar of Texas,* 763 S.W.2d 397, 398, 401-02 (Tex.1988) (holding that "a ban against in-person solicitation of clients by lawyers or runners is substantially related to legitimate state goals and could not be more narrowly tailored").  *See generally Lawyer Disciplinary Bd. v. Allen,* 198 W.Va. 18, 479 S.E.2d 317, 328 (1996) (holding that commercial speech jurisprudence does not protect "direct telephone solicitation of a prospective client with whom the lawyer has no family or prior professional relationship, when at least partially motivated by the potential for the lawyer's pecuniary gain").

Prior to its restricting in-person solicitation, New Jersey experienced "definite social harms" such as "harassment, over-reaching, provocation of nuisance litigation and schemes for systematic fabrication of claims[.]"  New Jersey Rules of Ct., R. Prof. Conduct 7.3 cmt.  (West 1997).

[19]These states are:  (1) Connecticut, (2) Maryland, (3) Missouri, (4) Nebraska, (5) New Mexico, (6) New York, (7) Oregon, (8) Vermont, (9) Wisconsin, and (10) Wyoming.  (For citations, see *supra* note 5.) *See generally Unnamed Att'y v. Attorney Grievance Comm'n,* 313 Md. 357, 545 A.2d 685, 691 (1988) ("[W]ritten modes of solicitation (*as opposed to in-person solicitation* ) are protected by the First Amendment, regardless of the recipient's condition, so long as such communication is neither false, misleading, nor overreaching.") (emphasis added).

The regulations that these twelve states (including Georgia and Ohio) employ resemble the ABA's Model Code of Professional Responsibility (1980), the predecessor to the Model Rules.  The Model Code is not materially different from the Model Rules with respect to in-person solicitation.  If anything, the Model Code is less restrictive than the Model Rules because only the former (at least Georgia's and Ohio's version of it) permits lawyers to solicit "close friends."  Standard 17(a);  Tr. at 207 (testimony of the State Bar's general counsel).

Prior to their restricting in-person solicitation, Connecticut and Maryland, like New Jersey, experienced "definite social harms" such as "harassment, over-reaching, provocation of nuisance litigation and schemes for systematic fabrication of claims[.]"  Connecticut Rules of Ct., Rules Prof. Conduct 7.3 cmt.  (West 1997);  Maryland Rules of Ct., R. Proced. 16-812, R. Prof. Conduct 7.3 cmt.  (West 1998).

18

appear to prohibit in-person, uninvited solicitation under any circumstance.[20]  Virginia allows

in-person solicitation for many purposes except "compensation in a personal injury or wrongful

death claim."[21]  California's rule begs the question, that is, it prohibits lawyers and their agents from

soliciting most potential clients unless the First Amendment protects their speech.[22]  Only four

jurisdictions—the District of Columbia, Maine, Montana and North Dakota—liberally permit

in-person solicitation, but not without limitation.[23]

---

[20]*See* Iowa Code Ann. tit. XV, subtit. 2, ch. 602 app., Code Prof. Resp. for Lawyers, DR 2-101(B)(4)(a) (West 1998) (banning "in-person ... solicitation of legal business *under any circumstance* ") (emphasis added);  Massachusetts Rules of Ct., Supreme Judicial Ct. R. 3:07, R. Prof. Conduct 7.3(d) & cmt.  (West 1998) (absent the prospective client's initiation, "[a] lawyer shall not solicit professional employment for a fee from a prospective client in person");  *cf.*  In the *Matter of Amendment to S.J.C. Rule 3:07, DR 2-103 & DR 2-104,* 398 Mass. 73, 495 N.E.2d 282, 286 (1986) (adopting a "prophylactic rule imposing a blanket ban on *all* in-person solicitation[,]" including friends, relatives and former clients, because "unless the prohibition is all inclusive, the Commonwealth's interests in professionalism and the prevention of misrepresentation and overreaching are not adequately served") (emphasis added).

[21]Virginia Rules of Ct., Supreme Ct. Rules, part 6, § 2, Code Prof. Resp., DR 2-103(A), (F) (West 1997) (absent lies, undue influence, harassment, etc., or "a substantial potential for" any such conduct, lawyers may solicit potential clients for professional employment other than "compensation in a personal injury or wrongful death claim").

[22]*See* Cal. Bus. & Prof.Code, R. Prof. Conduct for the State Bar 1-400(C) (West 1998);  *cf.*  In *Matter of Scapa,* Nos. 88-0-12498, 88-0-12499, 2 Cal. State Bar Ct. Rptr. 635, 652 (Cal.Bar Ct., Nov. 3, 1993) (evidence that lawyers' agents solicited injured persons "armed with police accident reports the victims wanted and often could not obtain themselves as quickly" showed "the constitutional justification for California's rules prohibiting in-person solicitation").

[23]*See* District of Columbia Rules of Ct., Rules Governing the Bar app.  A, R. Prof. Conduct 7.1(b)-(d) (West 1998) (absent lies or undue influence, lawyers may solicit potential clients face-to-face unless they are "apparently in a physical or mental condition which would make it unlikely that the potential client[s] could exercise reasonable, considered judgment as to the selection of a lawyer");  Maine Rules of Ct., Bar Rules, Code Prof. Resp., Rule 3.9(f) (West 1997) (absent lies or harassment, lawyer may solicit a potential client face-to-face unless "the circumstances create an appreciable risk of undue influence by the lawyer or ill-considered action by the person being solicited" such as someone "under treatment in a hospital");  Montana Rules of Ct., R. Prof. Conduct 7.3 (West 1997) (absent harassment, a lawyer may solicit a potential client face-to-face unless he or she tells the lawyer to stop or the lawyer "knows or

As for "simple common sense," we need go no further than the four-corners of *Ohralik.* Contrasting in-person solicitation from "truthful, restrained advertising concerning the availability and terms of routine legal services," prohibitions on which the Court struck down in *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the Court opined that

> [u]nlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking; there is no opportunity for intervention or counter-education by agencies of the Bar, supervisory authorities, or persons close to the solicited individual. The admonition that "the fitting remedy for evil counsels is good ones" is of little value when the circumstances provide no opportunity for a remedy at all. In-person solicitation is as likely as not to discourage persons needing counsel from engaging in a critical comparison of the "availability, nature, and prices" of legal services ...; it actually may disserve the individual and societal interest ... in facilitating "informed and reliability decisionmaking."

*Ohralik,* 436 U.S. at 454, 457-58, 98 S.Ct. 1912 (internal citations and footnotes omitted). Several Court decisions echo this "common sense," reading *Ohralik* to mean that "a State may categorically

---

reasonably should know that the physical, emotional, or mental state of the person is such that the person cannot exercise reasonable judgment in employing a lawyer"); North Dakota Ct. Rules, R. Prof. Conduct 7.1 (West 1998) (absent lies, undue influence, harassment, etc., a lawyer may engage in in-person, uninvited solicitation).

Although it generally finds "no significant distinction between disseminating information and soliciting clients through mass media or through individual personal contact[,]" the District of Columbia does recognize that "[i]n-person solicitation can ... create additional problems" in circumstances "not conducive to intelligent, rational decisions." District of Columbia Rules of Ct., Rules Governing the Bar app. A, R. Prof. Conduct 7.1 cmt. (West 1998).

This consensus information stands in sharp contrast to that in *Edenfield,* where only four states, including Florida, prohibited CPA's from soliciting potential clients face-to-face. 507 U.S. at 771, 113 S.Ct. 1792. As to lawyers, the converse exists—only four jurisdiction allow in-person solicitation, and even they employ some restrictions on it.

ban" all "in-person solicitation by lawyers for profit[.]" *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 472, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988); *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,* 471 U.S. 626, 641, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (The "possibilities for overreaching, invasion of privacy, the exercise of undue influence, outright fraud" and other "unique features of in-person solicitation by lawyers ... justif[y] a prophylactic rule prohibiting lawyers from engaging in solicitation for pecuniary gain[.]"); *In re R.M.J.,* 455 U.S. 191, 202, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) ("In *Ohralik* [,] .... the Court held that the possibility of fraud, undue influence, intimidation, overreaching, and other forms of vexatious conduct, was so likely in the context of in-person solicitation, that such solicitation could be prohibited.") (internal quotation marks omitted).

In light of the foregoing, we hold that the district court erred in concluding that the State Bar failed to justify Georgia's restrictions on commercial speech as contained within Standards 12, 16 (only as it relates to 12) and 17(a), but correctly found that Standards 13 and 16 (only as it relates 13) pass constitutional muster.[24] Unquestionably, the interests that the State Bar asserted are substantial, namely, protecting the public from vexatious conduct (Standards 12, 13, 16 and 17(a)); preventing invasions of privacy and improving the public's confidence in the legal profession (Standards 12, 16 (only as it relates to 12) and 17(a)); promoting the independent judgment of lawyers and prohibiting the unauthorized practice of law (Standards 13 and 16). *See Ohralik,* 436

---

[24]Additionally, the district court charged the State Bar with the wrong burden of proof. It stated that "the Bar ... failed to demonstrate that [the harms associated with in-person solicitation] are present *in all circumstances.*" (Emphasis added). In an as-applied challenge, however, "the constitutionality of a ban on personal solicitation will depend upon the *identity of the parties* and the precise *circumstances of the solicitation.*" *Edenfield,* 507 U.S. at 774, 113 S.Ct. 1792 (emphasis added).

21

U.S. at 462, 98 S.Ct. 1912; *Edenfield,* 507 U.S. at 769-70, 113 S.Ct. 1792; *Went For It,* 515 U.S. at 625, 115 S.Ct. 2371.

Standards 12, 16 (as it relates to 13) and 17(a) "directly and materially advance[ ]" at least one of these respective interests. *Went For It,* 515 U.S. at 624, 625 n. 1, 115 S.Ct. 2371. As we have discussed, the State Bar presented sufficient evidence as a matter of law to "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Went For It,* 515 U.S. at 626, 115 S.Ct. 2371 (internal quotation marks and citation omitted). The same conclusions are equally, if not more, applicable to Standards 13 and 16 (as it relates to 13). *See Ohralik,* 436 U.S. at 464 n. 22, 98 S.Ct. 1912 ("solicitation by a lawyer's agents or runners ... present[s] similar problems" as solicitation by a lawyer).

Finally, Georgia's prophylactic ban on in-person solicitation, whether the actor be a lawyer or a non-lawyer, stands in reasonable proportion to the interest served. *See Board of Trustees of the State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). The standards at issue are not over-inclusive as applied to the essential circumstances of this case, as "we do not see numerous and obvious less-burdensome alternatives[.]" *Went For It,* 515 U.S. at 633, 115 S.Ct. 2371 (internal quotation marks and citation omitted). Georgia does not prohibit lawyers from soliciting close friends, relatives or most clients. Further, they may seek professional employment from anyone who initiates the solicitation.[25] Importantly, many other modes of advertising are available to lawyers. *See Shapero,* 486 U.S. at 474, 108 S.Ct. 1916 ("The relevant inquiry is not whether there exist potential clients whose "condition' makes them susceptible to undue influence,

---

[25]Like the rules at issue in *Ohralik,* Georgia's standards do "not prohibit a lawyer from giving unsolicited legal advice; [they] proscribe[ ] the acceptance of employment resulting from such advice." 436 U.S. at 458, 98 S.Ct. 1912.

but whether the mode of communication poses a serious danger that lawyers will exploit any such susceptibility."); *e.g.,* State Bar's Initial Brief at 52 ("Nothing in the rules prohibit an attorney from sending potential clients written communications inviting the potential client to contact the lawyer if the individual would be interested in a personal presentation.").[26]  Accordingly, we affirm the district court's judgment as to Standards 13 and 16 (only as it relates to 13), but reverse its judgment as to Standards 12, 16 (only as it relates to 12) and 17(a).

B.

In its memorandum opinion following trial, the district court addressed the constitutionality of several other lawyer advertising standards that Falanga and Chalker challenged.  In the first of these standards, Georgia prohibits lawyers from creating an "unjustified expectation" about a client's chances, and comparing their services with those of another lawyer in a way that they cannot factually substantiate:

> A lawyer shall not make any false, fraudulent, deceptive, or misleading communication about the lawyer or the lawyer's services.  A communication is false or misleading if it:
>
> ...
>
> (2) is likely to create an unjustified expectation about results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the disciplinary rules or other law;  [or]
>
> (3) compares the lawyer's services with other lawyers' services, unless the comparison can be factually substantiated[.]

---

[26]The State Bar's general counsel testified that Standard 12 prohibits telephonic, as well as in-person, solicitation.  Falanga's and Chalker's motion for judgment on partial findings on the constitutionality of Standards 12 and 16, however, concerned only in-person solicitation, as did the district court's judgment.  Therefore, we need not decide whether Georgia's restriction on telephonic solicitation violates Falanga's and Chalker's commercial speech rights.

Georgia Rules of Ct. Ann., Rules & Regulations for the Org. and Gov't of the State Bar of Ga., Rule 4-102, Standard 5(a)(2)-(3) (Michie 1998).[27]  To this aim, lawyers may not, for example, employ the slogan "We will never lose a case!" on their letterhead:

> A lawyer shall not use a firm name, professional card, professional announcement card, office sign, letterhead, telephone directory listing, law list, legal directory listing or similar professional notice or designation that includes a statement or claim that is false, fraudulent, deceptive or misleading.  A statement or claim is false and misleading if it violates the provisions of Standard 5 [in this case, 5(a)(2) or 5(a)(3) ].

Georgia Rules of Ct. Ann., Rules & Regulations for the Org. and Gov't of the State Bar of Ga., Rule 4-102, Standard 8 (Michie 1998).[28]  The district court upheld these standards as constitutionally applied to Falanga and Chalker, concluding that:  (1) as a threshold matter, the State Bar has the absolute right to prohibit lawyers from stating or implying that they will violate the law;  (2) in any event, the State Bar has a substantial interest in "assuring the free flow of accurate information in the market place";  (3) it presented sufficient evidence of actual and likely miscomprehension from communications that create an unjustified expectation of success, and requiring factual substantiation helps to ensure accurate comparison of lawyers' services;  and (4) Standards 5(a)(2), 5(a)(3) and 8 "provide ... reasonable means for achieving" the state's interest.

Next, Georgia requires lawyers to disclaim written solicitations as "Advertisements" patently on the envelope's face and at the top of each page:

> Written communications to a prospective client for the purpose of obtaining professional employment shall be plainly marked "Advertisement" on the face of the envelope and on the

---

[27]State authorities may punish a lawyer who violates Standard 5(a)(2) or 5(a)(3) with any level of discipline up to and including disbarment.  *See* Standard 5(a);  Rule 4-102(b).

[28]Unlike Standard 5(a), Standard 8 permits any level of discipline up to and including a public reprimand, not disbarment.  *See* Standard 8;  Rule 4-102(b).

top of each page of the written communication in typesize no smaller than the largest typesize used in the body of the letter.

Georgia Rules of Ct. Ann., Rules & Regulations for the Org. and Gov't of the State Bar of Ga., Rule 4-102, Standard 6(b) (Michie 1998).[29] Rejecting Falanga's and Chalker's constitutional challenge of this standard, the district court found that: (1) the State Bar has a substantial interest in reducing consumer confusion and protecting consumers' privacy; (2) "[t]he State Bar ... provided sufficient evidence of the harm that [it] seeks to prevent"; and (3) Standard 6(b) "is a reasonable means of preventing the harms asserted" since "the [advertisement] designation allows the consumer to choose whether he or she is interested in the information it contains and prevents the communication from being misleading by omission."

Additionally, just as written solicitations must be disclaimed as advertisements, "[a] public communication for which a lawyer has given value must be identified as such unless it is apparent from the context that it is such a communication." Georgia Rules of Ct. Ann., Rules & Regulations for the Org. and Gov't of the State Bar of Ga., Rule 4-102, Standard 7(a) (Michie 1998).[30] The district court held that this standard does not run afoul of the First Amendment, finding that: (1) "[t]he State Bar has a substantial interest in reducing consumer confusion and ... insuring the accurate flow of information"; (2) allowing "the consumer to know whether the ... subject of the communication was newsworthy in its own right or ... purchased" directly and materially serves these interests because it "provides additional information ... as to the impetus of the

---

[29]State authorities may punish a lawyer who violates Standard 6(b) with any level of discipline up to and including disbarment. *See* Standard 6(b); Rule 4-102(b).

[30]State authorities may punish a lawyer who violates Standard 7(a) with any level of discipline up to and including a public reprimand. *See* Standard 7(a); Rule 4-102(b).

communication";  and (3) Standard 7(a) "is a reasonable means to ensure that communications regarding legal services are accurate and complete .... [and] does not impose any undue burden on the lawyer."

Finally, Georgia places restrictions on lawyers who wish to hold themselves out as "specialists":

> A lawyer may communicate the fact that the lawyer does or does not practice in particular fields of law.  A lawyer shall not state or imply that the lawyer is a specialist except as follows:
>
> (a) A lawyer admitted to engage in patent practice before the United States Patent and Trademark Office may use the designation "patent attorney" or a substantially similar designation;
>
> (b) A lawyer engaged in admiralty practice may use the designation "admiralty," "proctor in admiralty" or a substantially similar designation;  and
>
> (c) A lawyer who has been certified as a specialist in a particular field of law or law practice as a result of having successfully completed a program of legal specialization approved by the State Disciplinary Board of the State Bar of Georgia may publicly communicate the fact that he has satisfied the requirements of that particular program.

Georgia Rules of Ct. Ann., Rules & Regulations for the Org. and Gov't of the State Bar of Ga., Rule 4-102, Standard 18 (Michie 1998).[31]  The district court sustained this standard as well, concluding that:  (1) the State Bar has a substantial interest in "protecting consumers from misleading attorney advertising";  (2) it "demonstrated a substantial likelihood that the use of the word "specialist' could be misleading to consumers";  and (3) because of subsection (c) and the State Bar's representation in open court that "it would entertain additional categories of "specialist' at the request of a particular

---

[31]State authorities may punish a lawyer who violates Standard 18 with any level of discipline up to and including a public reprimand.  *See* Standard 18;  Rule 4-102(b).

26

practice group or area of law," "Standard 18 is a reasonable means ... to reduce or eliminate consumer confusion."[32]

Falanga and Chalker cross-appeal these rulings, arguing that the standards impermissibly snare truthful speech, are over-inclusive, fail to target "real" harm, and/or arbitrarily restrict legitimate advertising. The State Bar defends the district court's judgment, pointing to anecdotes, the study and other evidence that it introduced at trial. Upon *de novo* review and due consideration, "[w]e agree with the district court's analysis and need go no further[.]" *Wilson,* 132 F.3d at 1430. Each of these standards directly and materially advance at least one substantial state interest in a reasonably proportionate and narrowly-drawn manner. *See Went For It,* 515 U.S. at 624, 115 S.Ct. 2371; *Miller,* 117 F.3d at 1382. Accordingly, we readily affirm the district court's judgment that Standards 5(a)(2), 5(a)(3), 6(b), 7(a), 8 and 18 are constitutional as applied to Falanga and Chalker.

### III. CONCLUSION

In sum, we affirm the district court's judgment that Standards 5(a)(2), 5(a)(3), 6(b), 7(a), 8, 13, 16 (only as it relates to 13) and 18 survive First Amendment scrutiny as applied to Falanga and Chalker.[33] We reverse, however, the district court's judgment that Standards 12, 16 (only as it relates

---

[32]The Supreme Court of Georgia has reached similar conclusions about Standard 18. *See Matter of Robbins,* 266 Ga. 681, 469 S.E.2d 191, 193-194 (1996) (upholding the constitutionality of Standard 18 "on its face and as applied[,]" finding "a reasonable possibility that a significant percentage of the public reading the term "specialist' in a lawyer's advertisement[ ] might be misled into thinking an attorney has been "certified' or "designated' or has otherwise met objective standards established by a recognized organization").

[33]Pursuant to Eleventh Circuit Rule 36-1, we affirm but do not discuss three other issues that Falanga and Chalker present in their cross-appeal: (1) whether the district court erred in dismissing their claim that despite the State Bar's concession that it has not, does not and will not enforce them, the following statutes are unconstitutional: O.C.G.A. §§ 15-19-55, 15-19-56, 15-19-57(2) to (3), 15-19-58(2) to (4), 16-10-95(a)(3), 35-1-9 and 33-24-53; (2) whether the district court erred in failing to join Georgia's Attorney General or any other party necessary to litigate

to 12) and 17(a) are unconstitutional.[34]  We hold that Georgia's prohibiting lawyers and their agents from engaging in in-person, uninvited solicitation of professional employment does not violate the First Amendment commercial speech rights of Falanga, Chalker and other similarly situated lawyers who approach "unsophisticated, injured, or distressed lay person[s]." *Edenfield,* 507 U.S. at 774-75, 113 S.Ct. 1792 (quoting *Ohralik,* 436 U.S. at 465-66, 98 S.Ct. 1912).

     AFFIRMED IN PART;  REVERSED IN PART.

---

the constitutionality of these statutes;  and (3) whether the district court erred in denying Falanga's and Chalker's motions to compel and in granting the State Bar's motion for attorneys' fees incurred in opposing their motions to compel.

[34]We also reverse the district court's grant of attorneys' fees to Falanga and Chalker.  Simply put, they are no longer the "prevailing party" with regard to Standards 12, 16 (only as it relates to 12) and 17(a).  42 U.S.C. § 1988(b) (1994);  *cf. Hewitt v. Helms,* 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987) (section 1983 plaintiff was not the "prevailing party" because, among other reasons, he "obtained no relief" from the district court and "the Court of Appeals granted no relief of its own, declaratory or otherwise").  Consequently, Falanga's and Chalker's cross-appeal concerning the amount of fees awarded is moot.